1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KIFA MUHAMMAD, aka MARCUS               No.  2:21-cv-0411 KJN P
     JOHNSON,
12
                    Plaintiff,
13                                           ORDER AND FINDINGS AND
           v.                                RECOMMENDATIONS
14
     CASILLAS, et al.,
15
                    Defendants.
16

17

18         Plaintiff appears pro se and in forma pauperis in this civil rights action pursuant to 42

19   U.S.C. § 1983.  This matter was referred to a United States Magistrate Judge pursuant to 28

20   U.S.C. § 636(b)(1)(B) and Local Rule 302.  This action proceeds on plaintiff's Eighth

21   Amendment claims against defendants M. Casillas, J. Castro, J. Fisher, and C. Bernard.[1]

22   Defendants' fully briefed motion for summary judgment is before the court.  As discussed below,

23   the undersigned recommends that defendants' motion be granted.

24   I.  Plaintiff's Verified Complaint

25         While housed at Deuel Vocational Institution ("DVI"), plaintiff alleges that defendants,

26   correctional officers M. Casillas, J. Castro, J. Fisher, and C. Bernard, were deliberately

27   ───────────────────

28   [1]  On August 12, 2021, plaintiff consented to the dismissal of his claims under the Fifth and
     Fourteenth Amendments, and the ADA.  (ECF Nos. 12 & 13.)

                                              1

1   indifferent to plaintiff's safety by transporting plaintiff in a van not properly outfitted to

2   safely transport an inmate confined to a wheelchair in violation of the Eighth Amendment.

3   Defendant Casillas had previously transported plaintiff, and allegedly was aware plaintiff

4   required an ADA compliant transport.  Plaintiff reminded Casillas in Castro's presence that

5   plaintiff must be taken in his wheelchair because he was classified ADA.  Casillas told the other

6   three officers Casillas would have to take the slow truck "and one of them told [Casillas] to just

7   take the van."  (ECF No. 1 at 8.)  Casillas told plaintiff they were taking the van and "to slide in

8   so he can strap me in."  (Id.)  Defendants Casillas and Castro helped plaintiff into his seat.

9   Accompanied by defendant Castro, defendant Casillas drove the van in which plaintiff was

10   transported; the other defendants were in another van.  Plaintiff could not see the driver of the

11   other van.

12        About twenty minutes into the medical transport, the two vans allegedly began racing;

13   plaintiff's transport van was driven on the wrong side of the road facing oncoming traffic.  After

14   another 10 or 20 minutes, suddenly, defendant Casillas slammed on his brakes, swaying off the

15   road into a dirt area, as they almost collided with a car head on.  Plaintiff, who was not wearing a

16   seat belt, flew into the gate, hitting his head, foot, and elbow.  Both Casillas and Castro got out of

17   the van.  Plaintiff observed Casillas was nervous, walking back and forth, while the other prison

18   van kept going.  Despite plaintiff's request to return to the prison because he was "shook up,"

19   defendant Casillas continued to transport plaintiff to his medical appointment.  At the doctor's

20   office, plaintiff requested to use the bathroom and get some fresh air and showed the officers his

21   knee and arm were bleeding and told them his knee and foot were in a lot of pain.  Plaintiff was

22   told it would be an hour before he could see the doctor, and plaintiff kept asking to be returned to

23   the prison because he did not feel good.  Because plaintiff is claustrophobic, he started having

24   anxiety attacks, was sweating, had trouble breathing, and got a bad headache.  Plaintiff's transport

25   was not able to leave until everyone was done, and he was there for over 4 hours.  When he saw

26   Dr. Welborn, plaintiff explained the near-collision and that his foot and body hit the gate.

27   Plaintiff claims Dr. Welborn responded, "It don't look good."  (ECF No. 1 at 11.)

28        Upon return to the prison, plaintiff reported to the nurse (defendant Jane Doe) that they

almost had a wreck and showed her his injuries, which included a cut and swollen arm and knee. Plaintiff claims the nurse told plaintiff his blood pressure was high.  (ECF No. 11 at 11.)  Despite his request to see a doctor, the nurse told plaintiff he would have to put in for sick call and cleared plaintiff to go back to his cell.  Over a month later, plaintiff was seen by the doctor, and an x-ray allegedly revealed that plaintiff's foot was broken and showed that plaintiff had problems with his knee.  Plaintiff's foot was splinted.

Plaintiff alleges that defendants Casillas, Castro, Fisher, and Bernard violated plaintiff's Eighth Amendment rights by racing their vans without regard to plaintiff's safety or failing to intervene to stop such unsafe actions.  Such defendants also locked plaintiff up in a van for more than 6 [sic] hours, and handcuffed him while claustrophobic and suffering a broken foot, swollen knee, and bleeding arm in violation of the Eighth Amendment.  (ECF No. 1 at 12.)  Such defendants allegedly violated plaintiff's Eighth Amendment rights by failing to transport him in an ADA vehicle.  Finally, such defendants and defendant Jane Doe violated plaintiff's Eighth Amendment rights by failing to document the incident in a report and not allowing plaintiff to see a doctor for plaintiff's injuries, and Jane Doe failed to follow proper protocol when clearing him for return to his cell.

II. Background

Defendants' motion was filed on June 24, 2022.  (ECF No. 28.)  On September 26, 2022, plaintiff filed an opposition and a statement of undisputed facts.  (ECF Nos. 32, 33.)  Defendants sought and were granted an extension of time to file a reply, which was filed on November 17, 2022, along with objections to plaintiff's statement.  (ECF Nos. 36, 37.)

Unauthorized Surreply

On December 8, 2022, plaintiff filed a response to defendants' reply, along with a statement of disputed facts.  (ECF Nos. 38, 39.)

Parties do not have the right to file surreplies and motions are deemed submitted when the time to reply has expired.  Local Rule 230(l).  Courts generally view motions for leave to file a surreply with disfavor.  Hill v. England, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing Fedrick v. Mercedes-Benz USA, LLC, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005)).  However, district

1  courts have the discretion to either permit or preclude a surreply.  See JG v. Douglas County

2  School Dist., 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in

3  denying leave to file surreply where it did not consider new evidence in reply); Provenz v. Miller,

4  102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving

5  the non-movant an opportunity to respond).  Although plaintiff does not have a right to file a

6  surreply, in this instance the court exercises its discretion and considers the surreply in ruling on

7  defendants' motion for summary judgment.

8  III.  Legal Standard for Summary Judgment

9      Summary judgment is appropriate when it is demonstrated that the standard set forth in

10  Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

11  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

12  judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]

13          Under summary judgment practice, the moving party always bears
              the initial responsibility of informing the district court of the basis
14          for its motion, and identifying those portions of "the pleadings,
              depositions, answers to interrogatories, and admissions on file,
15          together with the affidavits, if any," which it believes demonstrate
              the absence of a genuine issue of material fact.
16

17  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

18  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

19  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

20  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

21  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

22  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

23  burden of production may rely on a showing that a party who does have the trial burden cannot

24  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

25  should be entered, after adequate time for discovery and upon motion, against a party who fails to

26

27  [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.
      However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he
28  standard for granting summary judgment remains unchanged."  Id.

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . ..  Where the record taken could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice filed June 24, 2022 (ECF No. 28), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

The Civil Rights Act

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show:  (1) he suffered a violation of his rights protected by the Constitution or created by federal statute; and (2) the violation was proximately caused by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  To satisfy the second prong, a plaintiff must allege facts showing how individually named defendants caused or personally participated in the harm alleged in the complaint.  Arnold v. IBM, 637 F.2d 1350, 1355 (9th Cir. 1981).  The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act he was legally required to do that caused the alleged deprivation.  Id. (citing Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978)).

IV.  Undisputed Facts[3] ("UDF")

1. Plaintiff Kifa Muhammad (aka Marcus Johnson or "plaintiff") is a state prisoner in the custody of the California Department of Corrections ("CDCR"), and at all relevant times was

---

[3]  For purposes of summary judgment, the undersigned finds these facts are undisputed.  Where plaintiff failed to properly address defendant's assertion of fact as required, this Court considers the fact undisputed.  See Fed. R. Civ. P. 56(e)(2).

1    housed at Deuel Vocational Institution ("DVI") in Tracy, California.

2         2.  During all times relevant herein, defendants M. Casillas, J. Castro, J. Fisher, and C.

3 Bernard were employed by CDCR as Correctional Officers assigned to the Transportation Unit at

4 DVI.

5         3.  Plaintiff has not worked in the medical field, does not have a nursing degree or

6 certificate, and has no formal training or licenses in the medical field.

7         4.  On October 16, 2019, a right ankle x-ray showed plaintiff had a "comminuted fracture

8 of the calcaneus (heel) with displaced fragments and compression," and "no additional fractures.[4]

9 (ECF No. 32 at 29, 62.)  Such injury was the result of a motor vehicle accident on September 20,

10 2019.  (ECF No. 28-1 at 126.)

11         5.  On February 5, 2020, plaintiff had a follow-up medical appointment with Dr. John

12 Welborn, an orthopedic specialist, at his medical offices in Pinole, California.

13         6.  On February 5, 2020, there were four transportation officers assigned to transport

14 inmates to Dr. Welborn's medical office:  defendants M. Casillas and J. Castro were assigned to

15 transport plaintiff; and J. Fisher and C. Bernard were assigned to transport two other unidentified

16 inmates.

17         7.  Since 2019, plaintiff has been classified or designated as an inmate with special

18 accommodations under the Americans with Disability Act ("ADA").  Plaintiff was designated an

19 ADA inmate due to his fractured right heel or calcaneus.

20         8.  Plaintiff was to be transported by wheelchair in an ADA truck which transports the

21 entire wheelchair.  It has a lift in the back that comes out and takes plaintiff in the wheelchair and

22 it is strapped down in the back of the truck.  Defendants Casillas and Castro transported plaintiff

23 in a newer van that had seat belts, not the ADA truck.

24         9.  Plaintiff was the only inmate in his transportation van on February 5, 2020.

25         10.  Plaintiff was secured in mechanical restraints, including handcuffs, leg restraints, and

26

27    [4]  The calcaneus is defined as "[t]he largest of the tarsal bones; it forms the heel and articulates
with the cuboid anteriorly and the talus superiorly."  132400 calcaneus, Stedmans Medical
28 Dictionary 132400 (Nov. 2014).

1  waist restraints prior to entering the CDCR medical transport van.

2      11.  The purpose of the mechanical restraints is to prevent escape while the inmate is away

3  from the institution.

4      12.  Once secured in restraints, defendants Casillas and Castro helped plaintiff into the

5  van for transport, but they did not put on his seat belt.  Plaintiff could not put on his own seat belt

6  because he was in restraints and could not move his hands.

7      13.  During the transport from DVI to Dr. Welborn's office, defendants Casillas and

8  Castro were in the van with plaintiff, and defendants Fisher and Bernard were in a separate

9  vehicle transporting other inmates.

10      14.  Defendant Casillas was the driver of the transport van escorting plaintiff.  Defendant

11  Castro was the passenger.  The three of them left DVI at 7:35 a.m. and plaintiff's medical

12  appointment was scheduled at 1:00 p.m.

13      15.  It is undisputed that a near collision occurred, and that defendant Casillas applied the

14  brakes to avoid a head-on collision.  The parties dispute how the near collision happened.[5]

15      16.  At this time, plaintiff hit his head, foot, and elbow on the front of the gate.  He told

16  defendants Casillas and Castro that he was shook up and nervous, did not want to go to the

17  medical appointment, and wanted to return to DVI.

18      17.  Defendants Fisher and Bernard declare they did not witness any vehicular collision or

19  near collision involving plaintiff or the CDCR transportation vehicle he was riding in because

20  they had taken a different route from DVI to Dr. Welborn's office on this date.

21      Plaintiff disputes their statements, claiming the two transport vans were racing, and that

22

23  [5]  Defendants contend that on the way to Dr. Welborn's medical offices in Pinole, California,
another vehicle traveling southbound on Tracy Boulevard drove across the center lines to pass a

24  slower moving vehicle and drove head-on toward the transportation van escorting plaintiff.
Defendant Casillas was traveling northbound on the two-lane highway when this passing vehicle

25  encroached into his lane.  Defendant Casillas applied the brakes to avoid being struck head-on by
this passing vehicle.  On the other hand, plaintiff contends that the two transport vehicles traveled

26  together on the two-lane road, and about 20 minutes in, the two drivers began racing, with
plaintiff's transportation vehicle traveling on the wrong side of the road.  About 10 or 20 minutes

27  later, defendant Casillas suddenly slammed on his brakes, swerving off the road into a dirt area,

28  as they almost collided with a car head on.

Fisher's van kept going after the near collision.  (ECF No. 1 at 10.)

18.  After the near-collision, defendants Casillas and Castro claim they looked at the back of the van and asked plaintiff if he was okay; plaintiff responded that he banged his knee and that he was all right.  Defendants Casillas and Castro did not observe any visible injuries on plaintiff's face, arms, or legs when they checked on his welfare.

In his verified pleading, plaintiff stated that he told Casillas and Castro that plaintiff was shook up and wanted to go back.  (ECF No. 1 at 9.)  In his deposition, plaintiff testified that defendants Casillas and Castro got out of the van, opened the sliding door, and talked to plaintiff, and asked plaintiff if he was all right.  (Pl. Dep. at 54.)  Plaintiff told them he wanted to go back to the prison.  (Pl. Dep. at 54-55.)

19.  Defendant Castro also called the sergeant back at DVI to provide a verbal report of what happened and to request instructions.[6]  Castro was informed to continue escorting plaintiff to the medical appointment at Dr. Welborn's office.

20.  When plaintiff's transportation van arrived at Dr. Welborn's office, defendant Casillas parked the van in the parking lot and opened the door.

Plaintiff claims that at the doctor's office he showed defendants Casillas and Castro plaintiff's knee, and arm were bleeding, and told them his knee and foot were in a lot of pain.  (ECF No. 1 at 10.)

21.  Upon arrival, plaintiff asked to use the bathroom and get fresh air.

22.  Defendant Fisher assisted in helping escort plaintiff out of the transportation van, and defendant Casillas took plaintiff to the bathroom and brought him back to the van.  Plaintiff told defendant Fisher that plaintiff wanted to be taken back to DVI.  Defendant Fisher was not part of the transportation team that took plaintiff from DVI to Dr. Welborn's office.

23.  While plaintiff was waiting for his medical appointment, he asked the correctional officers to take him to the bathroom and get him water to drink, which they did.

---

[6]  Defendants' brief and statement of undisputed facts claim defendant Casillas made the call (ECF No. 28 at 15, 28), but the declarations of Casillas and Castro both state that Castro made the call.

9

24.  Because the three of them arrived ahead of plaintiff's scheduled medical appointment at 1:00 p.m., plaintiff had to wait inside the van until his medical appointment.  The assistant at Dr. Welborn's office advised the defendants that the inmate needed to wait inside the van until they received a call that Dr. Welborn was ready to see each inmate for his scheduled medical appointment.

25.  Plaintiff waited for about four hours before he was seen by Dr. Welborn.

26.  The inmates were required to wait inside the van for safety and security reasons.  At that time, Dr. Welborn's office did not have facilities inside that could be used to safely house inmates who were waiting for their medical appointments.  At the conclusion of the medical appointments, the inmates were escorted back to the transportation van to wait for the other inmates to complete their medical appointments.

27.  It was not safe to have the inmates in a waiting room with civilians present because of the one-to-one ratio of inmates to officers.  If something were to happen, the number of officers might not be sufficient to quell a disturbance.  The presence of civilians could increase the risk of harm and make matters worse.

28.  During plaintiff's medical appointment, Dr. Welborn noted the pre-existing condition of plaintiff's fractured heel or calcaneus of the right foot from a motor vehicle accident in September of 2019 and did not note any additional injuries or trauma to the foot or any other part of plaintiff's body.  (ECF No. 28-1 at 66.)  No note was made of any near collision on the way to this appointment.[7]  Dr. Welborn noted that plaintiff was "still in wheelchair and cannot walk due to right heel pain," and ordered a lower extremity CT.  (Id.)

---

[7]  Plaintiff declares he told Dr Welborn about the near collision, and Dr. Welborn responded "It don't look good."  (ECF No. 1 at 11.)  However, Dr. Welborn's February 5, 2020 medical record makes no mention of the near collision or any additional injury.  (ECF No. 28-1 at 124.)  Rather, it references the fracture with malunion, which was identified on January 15, 2020, prior to the near collision.  (ECF No. 28-1 at 126.)  Plaintiff did not provide a declaration from Dr. Welborn. Plaintiff now claims that at this appointment, Dr. Welborn noted plaintiff's "foot was worse," took an x-ray of plaintiff's foot and saw "additional injuries and trauma which was noted (see _____)" (ECF No. 32 at 14), but plaintiff did not identify an exhibit, if any, that supports his claim.  And, again, Dr. Welborn's medical record from February 5, 2020, does not note that an x-ray was taken, or reflect any additional injuries or trauma to plaintiff's right foot, or include any notes confirming that Dr. Welborn found plaintiff's foot was worse.  (ECF No. 28-1 at 124.)

29.  After plaintiff's medical appointment, he was escorted to the van to wait for the other inmates to complete their medical appointments.  They had to wait until all the inmates were seen by Dr. Welborn before they could return to DVI.  They could not leave Dr. Welborn's office right after plaintiff was done with his medical appointment because the two CDCR transport vehicles were traveling back to DVI together.

30.  When defendant Fisher was finished with his escort at Dr. Welborn's office, he stopped by the area where the other transport team, defendants Casillas and Castro, were working, to see if they needed anything.  Fisher was told that no assistance was necessary at that time, and Fisher had no further contact with plaintiff's transport team that day.

31.  Defendant Bernard had no contact with plaintiff and does not recall any interactions with plaintiff on this date.

32.  Defendants Fisher and Bernard were required to accompany defendants Casillas and Castro before they could leave the parking lot.  Fisher and Bernard were escorting other inmates to and from their medical appointments.

33.  When the last inmate finished his medical appointment, defendants Fisher or Bernard escorted him from the medical facility to the van and assisted him into the van.  Then both vans departed the parking lot of Dr. Welborn's office and returned to DVI.

34.  Upon their return to DVI, defendants Fisher and Bernard were not tasked with checking in plaintiff to be medically cleared by the nurse upon plaintiff's return to DVI because Fisher and Bernard were not assigned to transport plaintiff on this date.  Defendants Casillas and Castro transported plaintiff to his medical appointment and were therefore tasked with checking plaintiff back into DVI.

35.  Upon return to DVI, plaintiff was medically evaluated by RN Lo according to procedure.

36.  RN Lo saw plaintiff at 4:46 p.m.  RN Lo charted that plaintiff returned from a medical appointment with Dr. Welborn to treat a calcaneus fracture.  No other injuries or ailments

////

////

were noted.[8]  (ECF No. 28-1 at 72-76.)  Plaintiff's active problems were listed as calcaneal

fracture and chronic foot pain.  (ECF No. 28-1 at 72.)  Lo's plan was noted as:

> Per outside provider "Rec he f/u 4 wk with CT of R foot calcaneus
> fx.  Likely will need orif or fusion and will need to be seen by ortho
> that has hospital with CDC contract bc surgery will need to be done
> in hospital."

(ECF No. 28-1 at 75.)

37.  No doctor has diagnosed plaintiff as having suffered an injury because of the events

of February 5, 2020.  (ECF No. 32 at 14.)

V.  The Parties' Evidence

Defendants' Evidence

Defendants provided the following evidence.

1.  Plaintiff's deposition testimony.  (ECF No. 28-1 at 5-36.)

2.  Plaintiff's temporary release orders.  (ECF No. 28-1 at 38-39.)

3.  DVI Transportation Vehicle Log.  (ECF No. 28-1 at 41-42.)

4.  Declaration of defendant Casillas.  (ECF No. 28-1 at 44-48.)

5.  Declaration of defendant Castro.  (ECF No. 28-1 at 50-54.)

6.  Declaration of defendant Fisher (ECF No. 28-1 at 56-59.)

7.  Declaration of defendant Bernard (ECF No. 28-1 at 61-62.)

8.  Plaintiff's medical records.  (ECF No. 28-1 at 65-136.)

Plaintiff's Evidence

Aside from his verified complaint,[9] plaintiff provided the following evidence:

---

[8]  Plaintiff claims that RN Lo said plaintiff had high blood pressure.  However, defendants'
objections (ECF No. 36) are well-taken that the medical record from plaintiff's visit with RN Lo
is the best evidence and speaks for itself.  Plaintiff has a history of hypertension.  (ECF No. 32 at
63.)  Lo recorded plaintiff's blood pressure as 146/87.  (ECF No. 28-1 at 72.)  But plaintiff
provided no medical expert testimony as to how Lo's medical record or specifically such blood
pressure reading should be interpreted.  Plaintiff also claims he told RN Lo he was almost in a
wreck and was in pain, but Lo's medical record does not mention the near collision or wreck, and
plaintiff provides no declaration from Lo as to their exchange on February 5, 2020.

[9]  The court considers as evidence those portions of the complaint that are based on plaintiff's
personal knowledge.  See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (citations omitted).

1   1. Plaintiff's declaration.[10]  (ECF No. 32.)

2   2. Plaintiff's medical records.  (ECF No. 32 at 29; 32-33; 62-69.)

3   3. DVI Transportation Vehicle Log.  (ECF No. 32 at 30.)

4   4. Remedial Plan re Transportation, amended Jan. 3, 2001, p. 26-27.  (Id. at 35-36.)

5   5. Discovery Responses.  (Id. at 38-55.)

6   6. Plaintiff's ADA Effective Communication Patient Summary.  (Id. at 57-58.)

7 VI. <u>Legal Standards</u>

8   The treatment a prisoner receives in prison and the conditions under which the prisoner is

9 confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual

10 punishment.  <u>See</u> <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993); <u>Farmer v. Brennan</u>, 511 U.S.

11 825, 832 (1994).  The Eighth Amendment "embodies broad and idealistic concepts of dignity,

12 civilized standards, humanity, and decency." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976).  But

13 conditions of confinement may be harsh and restrictive.  <u>See</u> <u>Rhodes v. Chapman</u>, 452 U.S. 337,

14 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter,

15 sanitation, medical care, and personal safety." <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1107 (9th

16 Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are

17 met:  (1) objectively, the official's act or omission must be so serious such that it results in the

18 denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison

19 official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  <u>See</u>

20 <u>Farmer</u>, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a

21 "sufficiently culpable mind."  <u>See</u> <u>id.</u>

22   To maintain an Eighth Amendment conditions of confinement claim, a prisoner must

23 show that prison officials were deliberately indifferent to a substantial risk of harm to his health

24 or safety.  <u>E.g.</u>, <u>Farmer</u>, 511 U.S. at 847; <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150-51 (9th Cir.

25

26 [10]  Plaintiff's declaration in opposition (ECF No. 32 at 1-2) and statement of undisputed facts

27 (ECF No. 33 at 1-4), both signed under penalty of perjury, are considered evidence, but only as to those matters based on plaintiff's own personal knowledge or perception.  Fed. R. Evid. 602, 701; <u>see also</u> <u>Johnson v. Meltzer</u>, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (verified motions

28 admissible to oppose summary judgment).

1   2010); Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).  The deliberate indifference standard

2   involves an objective and a subjective prong.  First, the alleged deprivation must be, in objective

3   terms, "sufficiently serious. . .."  Farmer, 511 U.S. at 834.  "[R]outine discomfort inherent in the

4   prison setting" does not rise to the level of a constitutional violation.  Johnson v. Lewis, 217 F.3d

5   726, 731, 732 (9th Cir. 2000) ("[m]ore modest deprivations can also form the objective basis of a

6   violation, but only if such deprivations are lengthy or ongoing").  Rather, extreme deprivations

7   are required to make out a conditions of confinement claim, and only those deprivations denying

8   the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an

9   Eighth Amendment violation.  Farmer, 511 U.S. at 834; Hudson v. McMillian, 503 U.S. 1, 9

10  (1992).  The circumstances, nature, and duration of the deprivations are critical in determining

11  whether the conditions complained of are grave enough to form the basis of a viable Eighth

12  Amendment claim.  Johnson v. Lewis, 217 F.3d at 731.  Second, the prison official must "know[ ]

13  of and disregard[ ] an excessive risk to inmate health or safety. . . ."  Farmer, 511 U.S. at 837.

14  Thus, a prison official may be held liable under the Eighth Amendment for denying humane

15  conditions of confinement only if he knows that inmates face a substantial risk of harm and

16  disregards that risk by failing to take reasonable measures to abate it.  Id. at 837-45.  Mere

17  negligence on the part of the prison official is not sufficient to establish liability, but rather, the

18  official's conduct must have been wanton.  Farmer, 511 U.S. at 835; Frost, 152 F.3d 1128.

19  VII.  Discussion

20       A.  Failure to Use ADA Truck

21       Plaintiff claims his constitutional rights were violated when defendants chose not to

22  transport plaintiff in the ADA truck that provided a wheelchair lift.  Plaintiff recites numerous

23  discovery responses and prison policies (ECF No. 32 at 20-22), but provides no legal authority for

24  his view that the Constitution requires such transport.  He also argues that by not taking the ADA

25  van, defendants set in motion a series of acts that defendants used bad faith and acted wantonly.

26  (ECF No. 32 at 23) (citing Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1187 (9th Cir. 2006)

27  (plaintiff stated a claim for municipal liability where complaint alleged a deliberate pattern and

28  ////

policy of refusing to train lawyers for capital cases);[11] <u>Marsh v. County of San Diego</u>, 680 F.3d 1148 (9th Cir. 2012) (leaking child's autopsy photograph to press causing mother emotional distress without any legitimate governmental purpose shocked conscience).[12]  Both <u>Long</u> and <u>Marsh</u> are distinguishable on their facts, and plaintiff provides no facts to support his conclusory statement that any defendant used bad faith and acted wantonly in selecting the vehicle in which to transport plaintiff.  The record reflects that defendant Casillas, the transport officer who drove, selected the van, which is supported by plaintiff's deposition testimony.  (Pl. Dep. at 44 "other officers . . . convinced Casillas just to take the van.")  But plaintiff provides no additional facts that suggest such choice was made in bad faith or wantonly for the purpose of causing plaintiff harm.

In addition, violating prison policy or guidelines does not state a cognizable civil rights violation.  Section 1983 provides a cause of action for the deprivation of federally protected rights.  "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, [s]ection 1983 offers no redress."  <u>Sweaney v. Ada County, Idaho</u>, 119 F.3d 1385, 1391 (9th Cir. 1997) (quoting <u>Lovell v. Poway Unified Sch. Dist.</u>, 90 F.3d 367, 370 (9th Cir. 1996)); <u>See</u> <u>Davis v. Kissinger</u>, 2009 WL 256574, *12 n.4 (E.D. Cal. Feb. 3, 2009).  There is also no liability under § 1983 for violating prison policy.  <u>Cousins v. Lockyer</u>, 568 F.3d 1063, 1070 (9th Cir. 2009) (quoting

---

[11]  The court in <u>Long</u> identified a triable issue under Monell where "the County knew" that the plaintiff had a severe medical condition and that he was being housed in a unit that was not equipped to provide the care he needed.  <u>Long</u>, 442 F.3d at 1188.  Expert testimony was presented to support the position that the County "lacked adequate policies requiring" that unit to transfer patients to a one equipped to handle them if certain symptoms were identified, "to notify a physician promptly when an inmate falls, and when an inmate refuses essential medical treatment," such as when the plaintiff refused oxygen.  <u>Id.</u> at 1190.

[12]  In <u>Marsh</u>, family members filed a section 1983 action objecting to publication of photos of their son's autopsy and death scene.  <u>Marsh</u>, 680 F.3d at 1153.  The Ninth Circuit, regarding the case as a matter of first impression, held that the common law right to non-interference with a family's remembrance of a decedent is so ingrained in our traditions that it is constitutionally protected.  <u>Id.</u> at 1154.  The Ninth Circuit started by recognizing that family members have a well-established common law privacy right to protect a loved one's death images from publication.  <u>Id.</u> at 1153.  The Ninth Circuit held that the common law right was so ingrained that it rose to the level of a constitutional right.

1    Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997)).  Thus, plaintiff's allegations that

2    defendants violated any prison regulation, rule, or policy by failing to transport plaintiff in the

3    ADA vehicle do not amount to a cognizable claim under federal law, and do not constitute an

4    independent cause of action under section 1983.

5        Therefore, defendants are entitled to summary judgment on plaintiff's claim that

6    defendants failed to transport plaintiff in an ADA vehicle.

7        B.  Eighth Amendment Conditions of Confinement Claims

8            1.  Near Collision

9        Plaintiff and defendants dispute how the near collision happened.  (UDF 15 & n.4.)

10   However, as discussed below, such differences do not preclude summary judgment based on the

11   facts and evidence presented here.

12       A prisoner's Eighth Amendment rights are violated when officials are deliberately

13   indifferent to a prisoner's need for safety.  Farmer, 511 U.S. at 833.

14       The Ninth Circuit has not yet found an Eighth Amendment deliberate indifference claim

15   in the context of a correctional officer's failure to secure an inmate's seat belt during transport,

16   but an unpublished memorandum decision suggests that such a claim may be alleged.  See, e.g.,

17   Ford v. Fletes, 211 F.3d 1273, 2000 WL 249124 at *1 (9th Cir. 2000) (unpublished) (recognizing

18   that prisoner may be able to allege facts showing deliberate indifference when he was injured

19   from fall out of a vehicle while transported in handcuffs behind his back in a vehicle without

20   doors, seat belts or restraints) (citing Farmer, 511 U.S. at 837).

21       Other courts have found that the failure to provide or secure a seat belt to a prisoner

22   during transport does not, without more, violate the Eighth Amendment.  Dexter v. Ford Motor

23   Co., 92 F. App'x 637, 641 (10th Cir. 2004) ("[A] failure to seat belt does not, of itself, expose an

24   inmate to risks of constitutional dimension."); Wilbert v. Quarterman, 647 F. Supp. 2d 760, 769

25   (S.D. Tex. 2009) ("Considering the different circuit court opinions, it appears that an allegation of

26   simply being transported without a seat belt does not, in and of itself, give rise to a constitutional

27   claim."); Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 437 (S.D. N.Y. 2004) ("'[A]

28   failure to seat belt does not, of itself, expose an inmate to risks of constitutional dimension'

because the 'eventuality of an accident is not hastened or avoided by whether an inmate is seat[-]belted.'") (quoting <u>Dexter</u>, 92 F. App'x at 641); <u>Simon v. Clements</u>, 2016 WL 8729781, at *1 (C.D. Cal. June 10, 2016) ("The law is clear that inmates who are transported by correctional officers do not have a constitutional right to the use of seat belts."); <u>Newman v. County of Ventura</u>, 2010 WL 1266719, at *10 (C.D. Cal. Mar. 8, 2010) ("[P]laintiff has no constitutional right to seat belts."), <u>report and recommendation adopted</u>, 2010 WL 1266725 (C.D. Cal. Mar. 26, 2010); <u>King v. San Joaquin Cty. Sheriff's Dep't</u>, No. CIV S-04-1158 GEB KJM, 2009 WL 577609, at *4 (E.D. Cal. Mar. 5, 2009) ("[A] prison's or jail's failure to equip a van or bus with seat belts for the prisoners does not rise to the level of deliberate indifference as a matter of constitutional law."), <u>report and recommendation adopted</u>, 2009 WL 959958 (E.D. Cal. Apr. 6, 2009).[13]

    "However, if the claim is combined with allegations that the driver was driving recklessly, this combination of factors may violate the Eighth Amendment." <u>Wilbert</u>, 647 F. Supp. 2d at 769. See also <u>Brown v. Fortner</u>, 518 F.3d 552, 559-60 (8th Cir. 2008) (affirming denial of summary judgment where "uncontested evidence indicates [defendant] knew [prisoner] was shackled and restrained in a manner that prevented him from securing his own seat belt, . . . rejected [prisoner's] request for a seat belt . . . [and] drove recklessly and ignored requests by the inmate passengers in his van for him to slow down."); <u>Brown v. Morgan</u>, 39 F.3d 1184, at *1 (8th Cir. 1994) (unpublished) (per curiam) (finding allegations that deputy refused to let prisoner wear a seat belt, drove at a "high speed in bad weather," refused to slow down "despite pleas for him to do so, purposely spe[d] up, and smil[ed] when he saw [prisoner] was scared," "sufficient to manifest deliberate indifference for his safety" under the Eighth Amendment); <u>Simon</u>, 2016 WL 8729781, *2 ("Facts such as whether seat belts were available for use, whether the inmate requested the use of a seat belt, whether the driver knew the inmates were not secured by seat

---

[13]  Plaintiff appears to clarify that he is not challenging the failure of defendants to fasten his seat belt, conceding that whether the failure to provide seat belts violates the Constitution has been addressed on several occasions by federal courts.  (ECF No. 32 at 20.)  Indeed, there are numerous exceptions to California Vehicle Code § 27315 cited by plaintiff; one exception, § 27315(g), states that the seat belt requirement does not apply to a passenger in a seat behind the front seat of a vehicle driven by a peace officer.  See <u>King</u>, 2009 WL 577609, at *5.

1   belts, how the officer drove the vehicle, and the traffic conditions at the time of an incident

2   causing injury are all relevant to a determination of whether an inmate can state a claim."); Brown

3   v. Saca, 2010 WL 2630891, at *3-4 (C.D. Cal. June 9, 2010) (finding allegations of "fully

4   shackled" prisoner, who asked officers to secure his seat belt, was "refused" and "taunt[ ]ed," and

5   whose restraints "prevented him from either securing his seat belt or bracing himself in the event

6   of an accident," alleged Eighth Amendment deliberate indifference claim because he also alleged

7   defendants drove "erratically," and "recklessly drove the van in reverse striking another

8   vehicle."), report and recommendation adopted, 2010 WL 2630998 (C.D. Cal. June 28, 2010);

9   Ortiz v. Garza, 2016 WL 8730726 at *4 (E.D. Cal. 2016) ("Because [prisoner] alleges [defendant]

10  was aware the [shackled] prisoners did not have safety restraints, yet drove at high speeds and hit

11  a stationary object, he alleges facts sufficient to [show] deliberate indifference to his safety in

12  violation of the Eighth Amendment.").  The critical inquiry shared by the cases cited above is the

13  state of mind of the defendants when the prisoner was deprived of a seat belt.

14      Here, defendants contend that plaintiff's allegations -- that defendant Casillas was racing

15  the other transportation van, slammed on brakes, and swerved to avoid a head-on collision -- do

16  not establish a serious deprivation of plaintiff's Eighth Amendment right to be free from cruel and

17  unusual punishment.  (ECF No. 28 at 23) (citing Farmer, 511 U.S. at 833; see also Phanor v.

18  Powell, 2008 WL 4218493, at *2 (E.D. Cal. Sept. 5, 2008) ("allegations that defendants drove too

19  quickly in the rain and followed too closely is not a sufficiently serious deprivation of plaintiff's

20  Eighth Amendment right to be free from cruel and unusual punishment.").

21      The undersigned agrees that suddenly stopping a vehicle, particularly to avoid a head-on

22  collision, is not inherently reckless in nature.  However, if plaintiff provides evidence that the

23  defendants were aware of a substantial risk of harm to plaintiff but chose to race their transport

24  vans on a two-lane rural road despite such risk, a jury could find such drivers were deliberately

25  indifferent.  Defendants, who deny they were even traveling on the same road, let alone racing,

26  object that plaintiff provided only his own self-serving statements as to what transpired on

27  February 5, 2020.  However, plaintiff was an eye and ear-witness to the events of February 5,

28  2020.  Thus, his statements made under penalty of perjury are evidence of what he witnessed on

18

that date.  While defendants Castro and Casillas dispute what caused the near collision, if there are material questions of fact as to whether defendants were deliberately indifferent, such questions are for the jury to decide.

Like the prisoners in <u>Wilbert</u>, <u>Fortner</u>, <u>Morgan</u>, <u>Saca</u>, and <u>Simon</u>, plaintiff claims he was shackled and unable to fasten his own seat belt; it is undisputed that defendants Castro and Casillas did not fasten plaintiff's seat belt.  (See ECF No. 1 at 10; UDF 12); cf. <u>Wilbert</u>, 647 F. Supp. 2d at 770; <u>Fortner</u>, 518 F.3d at 556; <u>Morgan</u>, 39 F.3d at 1184 *1; <u>Saca</u>, 2010 WL 2630891 at *3; <u>Simon</u>, 2016 WL 8729781 at *1.  Plaintiff next declares that the two transport vans were "racing," and during the transport, defendant Casillas braked suddenly, and plaintiff was thrown forward into the gate, hitting his head, foot, and elbow.  (ECF No. 1 at 9.)

Critically, however, plaintiff's verified complaint and declarations, unlike the allegations raised by the prisoners in <u>Wilbert</u>, <u>Brown</u>, <u>Morgan</u>, and <u>Saca</u>, do not contain any further facts to show any defendant acted with a culpable state of mind; that is, that such defendants were consciously aware they were placing plaintiff's safety at substantial risk.  See <u>Wilbert</u>, 647 F. Supp. 2d at 770 (defendant rejected Wilbert's request to fasten seat belt, and prisoner "complained that the van was traveling at an unsafe speed"); <u>Fortner</u>, 518 F.3d at 559 ("In addition to the refusal to fasten [prisoner's] seat belt, . . . [prisoner] offered evidence that Fortner was driving in excess of the speed limit, following too closely to the lead van, crossing over double-yellow lines, and passing non-convoy cars when the road markings clearly prohibited doing so."); <u>Morgan</u>, 39 F.3d at 1184 *1 (alleging defendant refused to fasten prisoner's seat belt, and was "driving at a high rate of speed in bad weather, refusing to slow down despite [prisoner's] pleas for him to do so, purposely speeding up, and smiling when he saw that [prisoner] was scared"); <u>Saca</u>, 2010 WL 2630891 at *3-4 (Saca and Crispin refused to secure prisoners' seat belts, despite their requests, and "replied with taunts," then Saca drove "erratically," and "recklessly drove the van in reverse," striking another vehicle).

Here, plaintiff does not declare that any defendant refused to fasten plaintiff's seat belt, or that plaintiff demanded Casillas slow down or stop, or that either defendant Casillas or defendant Castro verbally taunted plaintiff or acted in any way that suggested they were intentionally

1   disregarding a substantial risk of serious harm to plaintiff as was alleged in <u>Morgan</u> and <u>Saca</u>.  In

2   addition, while plaintiff could see out of the side window of his transport van, he testified that he

3   could not identify the driver of the other transport van.  (Pl. Dep. at 82.)  Plaintiff also testified

4   that he could "barely see" out of the front of his transport van because a black flag was

5   "blocking" his view.  (Pl.'s Dep. at 49.)

6        Plaintiff further declares his transport van was on the wrong side of the road.[14]  He argues

7   that high speed driving on the wrong side of the street raises a substantial risk of serious harm to

8   inmate safety and health.  (ECF No. 38 at 3) (citing <u>Castro v. County of Los Angeles</u>, 833 F.3d

9   1060 (9th Cir. 2016).  He then states, "even if defendants were not racing, why were they driving

10  on the wrong side of the road at a high speed?"  (ECF No. 38 at 3.)  However, because the road

11  was two lanes, drivers must travel on the wrong side of the road to pass slower moving vehicles,

12  and likely speed up to do so.  In any event, plaintiff's statements made under oath do not evidence

13  an intent to punish or other improper motive on the part of any defendant.  For example, in <u>Bulkin</u>

14  <u>v. Ochoa</u>, 2016 WL 7159286 (E.D. Cal. Dec. 7, 2016), summary judgment was denied because

15  the prisoner adduced evidence of the driver's intent to deprive Bulkin of a seatbelt:  Ochoa

16  provided seatbelts to all the other passenger inmates except Bulkin; Ochoa refused Bulkin a

17  seatbelt when Bulkin asked for one, made taunting comments, and then drove recklessly while

18  looking at Bulkin in the rearview mirror and laughing, verbally taunted Bulkin when he

19  complained about the speed, then laughed with another defendant who Ochoa then high-fived.  <u>Id.</u>

20  at *8, <u>report and recommendation adopted</u>, 2017 WL 414708 (E.D. Cal. Jan. 30, 2017).  <u>See also</u>

21  <u>Hill v. Fields</u>, No. 22-cv-2418 TLN DB, 2021 WL 3708681, at *4 (E.D. Cal. Aug. 20, 2021) (Hill

22  claimed Fields put Hill in the cargo area without a seatbelt despite Hill's request for one, laughed

23  at Hill when he fell, and "slammed on the brakes" while Hill was in a compromised position in an

24  attempt to keep another defendant laughing.); <u>Fortner</u>, 518 F.3d 552, 560 (8th Cir. 2008)

---

[14]  In his brief, plaintiff now argues that while he was on the wrong side of the road, "he kept yelling to slow down since it made plaintiff nervous and scared."  (ECF No. 32 at 23.)  Plaintiff did not include such fact in his verified complaint, his declarations, or in his deposition testimony. But even if he had, it would not change the outcome here because plaintiff failed to show any defendant refused to fasten plaintiff's seatbelt or exhibited any other conduct reflecting a culpable state of mind.

1   (affirming denial of summary judgment against officer where inmate's request for seat belt was

2   rejected and officer drove recklessly, ignoring requests to slow down);

3          Here, the undersigned finds plaintiff's allegations more like the ones made by the prisoner

4   in <u>Simon</u>, who alleged he was "shackled in a manner that did not allow him to fasten his own seat

5   belt," and that the driver "did not secure [the prisoner's] seat belt for him," and then "was driving

6   at a high rate of speed when he slammed the van's brakes suddenly" causing Simon to be "thrust

7   violently forward, hitting his knees and head on a partition in front of his seat, causing injury."

8   2016 WL 8729781 at *1.  Like the Court in <u>Simon</u>, the undersigned finds that without some

9   additional "factual content that allows the court to draw the reasonable inference" that defendant

10  Casillas was acting recklessly and with deliberate indifference, plaintiff's allegations fail to

11  demonstrate an Eighth Amendment violation.  While plaintiff's allegations were initially

12  sufficient to state a cognizable Eighth Amendment claim, on summary judgment, plaintiff must

13  adduce evidence and facts from which a reasonable juror could find that defendants acted

14  recklessly and with deliberate indifference to plaintiff's safety, in other words, with a culpable

15  state of mind.  The undersigned finds that plaintiff has not done so.  Plaintiff's facts, viewed in

16  the light most favorable to him, demonstrate only possible negligence or gross negligence, not

17  deliberate indifference.

18         Plaintiff argues that the issue of whether defendants failed to act as a "reasonably prudent

19  and cautious person," is a question of fact for a jury to decide, citing California state law.  (ECF

20  No. 38 at 4.)  But such standard is for negligence, not deliberate indifference under the Eighth

21  Amendment.  As set forth above, deliberate indifference is a standard higher than negligence.

22         Because the undersigned finds there is no triable issue of material fact as to whether any

23  of the defendants acted with a culpable state of mind, all the defendants are entitled to summary

24  judgment on this claim.

25         Moreover, as to defendants Fisher and Bernard, such defendants declare they were not

26  present during the transport from DVI to Mr. Welborn's office and were not involved in and did

27  not witness the near collision.  But even assuming defendants Fisher and Bernard were traveling

28  with plaintiff's transport van, plaintiff adduced no evidence that either defendant was aware that

plaintiff's seat belt was not fastened.  It is undisputed that defendants Castro and Casillas placed

plaintiff into the van.  Also, that defendant Fisher drove his van on the proper side of the road,

even if speeding, is insufficient to demonstrate that Fisher was deliberately indifferent to a

substantial risk of serious harm to plaintiff's health and safety.  Plaintiff adduced no evidence that

Fisher or Barnard were attempting to communicate with Castro and Castillo, either by radio, or by

motioning from their van, to suggest they were encouraging a race.  Indeed, plaintiff concedes he

could not see the driver of the other van.  Plaintiff was not in Fisher's transport van and thus

cannot attest to what was said or done in such van.  Plaintiff provided no declarations from

inmates being transported in Fisher's van.  Thus, defendants Fisher and Bernard should also be

granted summary judgment on this basis.

> ### 2. Immediately After Near Collision

Defendants Castro and Casillas argue that they were not deliberately indifferent to

plaintiff's serious medical needs when they decided to proceed to plaintiff's medical appointment

after the near collision because there was no substantial risk to plaintiff's health or safety at that

time.  Defendants Casillas and Castro also did not draw an inference that plaintiff's health or

safety would be put at risk if they proceeded to transport plaintiff to his medical appointment

because "plaintiff did not present with any visual injuries after the incident," and thus had no

reason to know plaintiff required care.  (ECF No. 28 at 26.)  Moreover, defendants contend that

because this incident was an isolated incident, it is insufficient to violate plaintiff's civil rights.

Id., citing see Ray v. Scott, 2009 WL 4891819, at *4 (C.D. Cal. Sept. 23, 2009) (holding that

prisoner alleged no more than an isolated accident and not an intentional or ongoing violation of

his rights, dismissing case with prejudice).  (ECF No. 28 at 26.)

In opposition, plaintiff argues that after they pulled off the road, he told defendants

Casillas and Castro that plaintiff was "shook up and nervous and did not want to go to the

medical appointment but wanted to return to DVI to see a doctor or go to an emergency room."

(ECF No. 32 at 12-13.)  Plaintiff also claims that such defendants saw injuries on plaintiff but told

plaintiff they were not going back to the prison, or any emergency room and plaintiff would be

okay; but then plaintiff claims that such officers "never even looked at plaintiff."  (ECF No. 32 at

1   13.)

2          Again, plaintiff provides no evidence that defendants Casillas or Castro were deliberately

3   indifferent to plaintiff's health or safety by not returning plaintiff to DVI or taking him to an

4   emergency room.  Contrary to plaintiff's own arguments, he testified that after the van pulled

5   over, defendants Casillas and Castro opened the sliding door, talked to plaintiff, and asked him if

6   he was alright.  (Pl.'s Dep. 54.)  Plaintiff told defendants he was shook up and wanted to go back.

7   (Pl.'s Dep. 52-53.)  Defendants declare they did not observe any visible injuries on plaintiff's

8   face, arms, or legs.  Plaintiff adduced no medical evidence to support his claim that he sustained

9   injuries that were obvious.  Moreover, it was not until after the van arrived at Dr. Welborn's

10   office that plaintiff claims he showed the officers his knee and arm were bleeding and told them

11   his knee and foot were in a lot of pain.  Finally, it is undisputed that defendant Castro called the

12   sergeant for instructions on how to proceed and was told to proceed to the medical appointment.

13   (UDF 19.)  In addition, once plaintiff's transport van arrived at Dr. Welborn's office, plaintiff was

14   able to exit the van to go to the bathroom and, later, to attend his medical appointment.

15          Based on such evidence, plaintiff fails to demonstrate that there is a material dispute of

16   fact as to whether defendants Casillas and Castro were deliberately indifferent to plaintiff's health

17   and safety by opting to take plaintiff to his medical appointment rather than return him to DVI,

18   particularly where plaintiff would see an orthopedic specialist within a few hours.

19          Further, it is undisputed that defendants Fisher and Bernard were not present after the near

20   collision and plaintiff's transport van swerved off the road.  Thus, defendants Fisher and Bernard

21   are also entitled to summary judgment on this claim.

22          3.  Retention in Transport Van

23          Defendants argue that while plaintiff may have been uncomfortable remaining in the van

24   defendants did not believe that there was a safe alternative.  Dr. Welborn's office did not have

25   facilities to safely house waiting inmates; moreover, there were security issues with placing

26   inmates in a waiting room with civilians, given the ratio of inmates to officers, and the increased

27   risk of harm with the presence of such civilians.  In addition, the last inmate was in with the

28   doctor when plaintiff was escorted back to the van.  Defendants did not believe that keeping

1    plaintiff in the van until that last appointment was completed would endanger plaintiff.

2         Further, defendants argue that defendants Bernard and Fisher did not participate in the

3    decision to keep plaintiff waiting in the van and had little to no contact with plaintiff on this day.

4         Defendants contend that having plaintiff remain in the van for about four hours while the

5    last inmate completed his appointment served legitimate penological interests; the van conditions

6    and the amount of time spent did not constitute an extreme deprivation of life's necessities, and

7    plaintiff sustained no serious injury as a result.  Indeed, they claim he suffered no serious injuries

8    because of waiting in the van.  They argue that the undisputed evidence shows that the van

9    conditions did not constitute an extreme deprivation:  the door of the van was kept open, plaintiff

10   was allowed use of the restroom, and had drinking water upon request.  That plaintiff felt

11   claustrophobic does not indicate that he was deprived of any of life's necessities during the four

12   hour wait.  (ECF No. 28 at 27-28.)

13        Plaintiff maintains that defendants required plaintiff to remain in the transport van for

14   almost four hours despite knowing plaintiff was claustrophobic and was suffering anxiety-related

15   symptoms:  sweating, had trouble breathing and got a bad headache; plaintiff was suffering with a

16   broken foot, swollen knee, and bleeding arm.  Plaintiff declares he showed the officers that his

17   knee and arm were bleeding and told them his knee and foot were in a lot of pain.  (ECF No. 1 at

18   10.)

19        As set forth above, plaintiff must show that defendants' acts or omissions deprived

20   plaintiff of "the minimal civilized measures of life's necessities."  Farmer, 511 U.S. at 834.

21   Plaintiff must adduce evidence that each defendant "[knew] of and disregard[ed] an excessive risk

22   to inmate health and safety."  Id. at 835.

23        Here, plaintiff fails to adduce evidence that any of the four correctional officer defendants

24   disregarded an excessive risk to plaintiff's health or safety by requiring him to remain in the van

25   while he awaited his medical appointment.  First, plaintiff adduced no evidence rebutting

26   defendant Bernard's declaration that he had no contact with plaintiff on February 5, 2020.

27   Second, while it is undisputed that defendant Fisher assisted plaintiff out of the van, and plaintiff

28   declares he told defendant Fisher plaintiff wanted to return to DVI, plaintiff adduced no medical

evidence that defendant Fisher was aware that plaintiff was suffering a serious medical need that required return to DVI at that time, and plaintiff's retention in the van awaiting his appointment took place after Fisher helped him exit the van to go to the restroom.  Third, plaintiff adduced no evidence that either Fisher or Bernard could dictate plaintiff's return to DVI, given Castro and Casillas were charged with plaintiff's transport to and from Dr. Welborn's office on February 5, 2020.

Fourth, as to defendants Castro and Casillas, who oversaw plaintiff's transport, plaintiff adduced no evidence that such defendants acted with a culpable state of mind.  Indeed, their actions in allowing plaintiff to go to the bathroom, providing drinking water, and leaving the van door open do not evidence a culpable state of mind.  Such defendants also adduced evidence that there was no safe or secure alternative to retaining plaintiff in the van until he could be seen by Dr. Welborn, and plaintiff provided no evidence to the contrary.

Fifth, as argued by defendants, because plaintiff was permitted to leave the van to go to the bathroom, was provided water, and the van door was left open to provide fresh air, plaintiff's retention in the van for about four hours did not constitute an extreme deprivation of life's necessities.  Plaintiff provided no medical evidence to demonstrate that his symptoms of claustrophobia posed a substantial risk of harm to plaintiff.

Sixth, the undersigned is not persuaded that the medical records show plaintiff suffered an additional fracture to his calcaneus in the near collision,[15] and while the August 14, 2020 medical

---

[15]  Indeed, the medical records appear to contain conflicting findings.  Dr. Laufik noted a "small lateral talar avulsion fracture" on April 8, 2020.  (ECF No. 28-1 at 123; 32 at 32.)  But the medical records dated March 4, 2020, and June 2, 2020, do not mention the small talar avulsion fracture.  (ECF No. 32 at 64, 66.)  Dr. Welborn's January 15, 2020 medical record noted plaintiff's calcaneus fracture had displaced – despite minimal displacement before, plaintiff now had "mal union of calcan [fracture.] (ECF No. 28-1 at 126.)  In the March 4, 2020 record, Dr. Welborn noted deterioration, but also referred to "probable 2nd injury to R calcan fx w further displacement."  (ECF No. 32 at 66.)  But in the June 2, 2020 diagnostic radiology report, Dr. Waters found "continued deformity of the calcaneus compatible with prior calcaneal fracture.  The fracture lines are better depicted on the prior CT scan.  Overall alignment is stable.  No new fracture. . . ."  (ECF No. 12 at 64.)  Further, on August 17, 2020, Dr. Sinale, DPM, reviewed plaintiff's diagnostic studies and x-rays and noted "incomplete healed comminuted fracture with subtalar joint compression of the subtalar joint depression," and "[n]o other acute fracture site/dislocation identified."  (ECF No. 32 at 69.)  Dr. Sinale also noted that plaintiff's "injury is

record refers to "pain" (ECF No. 32 at 33), such record, standing alone, is insufficient to demonstrate that following the near collision plaintiff suffered such pain that defendants Castro or Casillas knew, or should have known, that plaintiff required emergent medical care. Rather, the medical records provided by defendants demonstrate that plaintiff suffered chronic pain from the pre-existing calcaneus fracture. (See, e.g., ECF Nos. 28-1 at 72, 104; 32 at 69 ("due to persistent pain, he was provided with wheelchair").) On February 21, 2020, records show plaintiff was prescribed naproxen and 650 mg. Tylenol but refused Lyrica. (ECF No. 28-1 at 92, 93, 95, 114.) Moreover, the March 4, 2020 medical record reflects that plaintiff "had x-rays done on 2-19 because of slamming foot on gate while driving and *increased* pain." (ECF No. 32 at 66 (emphasis added).) Such medical records suggest that plaintiff's pain level increased following the February 5, 2020 incident, which finding is reinforced by Dr. Welborn's February 5, 2020 medical record reflecting no reports of pain within hours after the incident.

Finally, because the putative injury to his foot was not obvious,[16] no defendant could have made the inference that plaintiff required urgent medical care.[17] While the court does not

---

over 10-months old with the last CT scan with no significant healing of the comminuted fracture." (ECF No. 28-1 at 105.) Because ten months had not elapsed since the February 5, 2020 near collision, Dr. Sinale appears to refer to the initial injury plaintiff sustained in a motor vehicle accident in 2019.

Therefore, it is unclear from these medical records whether plaintiff's calcaneus was further fractured because of the near collision, particularly considering the earlier change in his heel injury, or by "deterioration" as referenced by Dr. Welborn, or sustained no new fracture, as documented by Dr. Waters and Dr. Sinale. Nevertheless, absent expert evidence, which plaintiff did not provide, the court is unable to determine the specific injury, if any, plaintiff sustained because of the near collision.

[16] Plaintiff's right foot was examined by an orthopedic specialist about four hours after the near collision, yet Dr. Welborn made no mention of any additional injury to plaintiff's right foot, or additional pain associated therewith. Rather, it appears that no one, including plaintiff, Dr. Welborn, RN Lo, or any defendant, was even aware of an additional injury, if any.

[17] Plaintiff argues that medical tests confirmed he also sustained injury to his left knee, but he points to no specific medical record that demonstrates such injury or a connection to the near collision. See Toscano v. Embree, 2007 WL 2753366, at *5 (N.D. Cal. Sept. 19, 2007) (explaining that the plaintiff cannot create a triable issue of fact by simply misrepresenting the contents of a document). The February 5, 2020 medical records of Dr. Welborn and RN Lo reflect no such injury. In addition, during physical therapy on September 29, 2020, plaintiff complained of knee weakness and discomfort with transfer, but the therapist noted plaintiff's left

1  minimize that plaintiff felt pain following the near collision, under these circumstances, the

2  undersigned cannot find the four hour delay in having plaintiff seen by Dr. Welborn instead of

3  taking plaintiff back to DVI or to an emergency room was sufficiently long as to require a jury's

4  resolution of plaintiff's Eighth Amendment claim.

5      Viewing the evidence in the light most favorable to plaintiff, the evidence is insufficient

6  for a reasonable jury to find that there was an objective substantial risk of serious harm to plaintiff

7  solely from his retention in the transport van for about four hours on February 5, 2020, or that any

8  defendant acted, or failed to act, with a culpable state of mind in retaining plaintiff in the van.

9  Thus, the undersigned recommends granting summary judgment in favor of all four correctional

10 officer defendants regarding plaintiff's retention in the transport van.

11      D.  Conclusion

12      For all the above reasons, it is recommended that defendants be granted summary

13 judgment.

14      E.  Qualified Immunity

15      Considering these findings, the undersigned declines to address the issue of qualified

16 immunity.

17 VIII.  Doe Defendant

18      As set forth above, plaintiff named a Doe defendant in his complaint, "Jane Doe."  (ECF

19 No. 11 at 11.)  On June 25, 2021, the court informed plaintiff of the difficulties presented by

20 naming Doe defendants and advised him he must promptly seek the identity of the Jane Doe

21 defendant through discovery, and then promptly move to amend the complaint to properly name

22 such defendant.  (ECF No. 8 at 4 n.1.)

23      Here, discovery closed on April 1, 2022, and plaintiff filed no motion to amend to

24 substitute the true name of Jane Doe.  Moreover, the evidence submitted with the named

25 defendants' motion for summary judgment reflects that the RN who cleared plaintiff for return to

26 his cell on February 5, 2020, was RN Lo.  It is unclear when plaintiff became aware of her

27

28 knee x-ray was unremarkable.[17]  (ECF No. 28-1 at 85.)

27

identity, but the medical record from the visit identified Lo as the RN who saw plaintiff that day (ECF No. 28-1 at 72-76) and could have been discovered by plaintiff during discovery or through review of his own medical records.

Thus, defendant Jane Doe should be dismissed without prejudice because plaintiff failed to identify the Jane Doe defendant by the discovery deadline.  The undersigned finds that the dismissal should be without leave to amend because Lo's medical record does not reflect that plaintiff reported the near collision, and Lo identified no significant injury other than plaintiff's pre-existing calcaneus fracture to his right foot.  Taking as true plaintiff's claim that Lo refused to let plaintiff see a doctor, but rather advised plaintiff to put in a request for sick call, standing alone, is insufficient to state an Eighth Amendment claim for deliberate indifference.  The record evidence demonstrates that plaintiff was unaware that the top of his right foot had an additional small fracture if, in fact, it was fractured at that time.  Moreover, plaintiff had just returned from a visit with Dr. Welborn, an orthopedic specialist, who also noted no other significant injury to plaintiff's right foot, other than plaintiff's pre-existing injury to his heel.  On this evidence, plaintiff cannot demonstrate that Lo was deliberately indifferent to plaintiff's serious medical needs by her alleged failure to allow plaintiff to see a doctor on one occasion.[18]

IX.  Conclusion

In accordance with the above, IT IS HEREBY ORDERED that:

1.   The Clerk of the Court is directed to assign a district judge to this case;

2.   Defendants' objections (ECF No. 36) are sustained; and

3.   Plaintiff's request to file a surreply (ECF No. 38) is granted.

Further, IT IS RECOMMENDED that:

1.   Defendants' motion for summary judgment (ECF No. 28) be granted;

2.   Defendant Jane Doe be dismissed without prejudice; and

3.   Judgment be entered accordingly.

---

[18]  Plaintiff also argues that RN Lo failed to follow proper procedure when clearing plaintiff to return to his cell.  However, as set forth above, allegations that a defendant violated prison procedures or policies are insufficient to state a claim under 42 U.S.C. § 1983.  Cousins, 568 F.3d at 1070.

1    These findings and recommendations are submitted to the United States District Judge

2  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

3  after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6  objections shall be filed and served within fourteen days after service of the objections.  The

7  parties are advised that failure to file objections within the specified time may waive the right to

8  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  Dated:  February 27, 2023

10

11                                    KENDALL J. NEWMAN
                                      UNITED STATES MAGISTRATE JUDGE
12

13  /muha0411.msj

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29